## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MICHAEL W. KENNY, individually and
on behalf of all others similarly situated,

           *Plaintiffs,*

vs.

CRITICAL INTERVENTION
SERVICES, INC.; KKP HOLDINGS,
LLC d/b/a THE KKP SECURITY
GROUP; KARL POULIN; KIMBERLY
POULIN; THE SOLOMON LAW
GROUP, P.A.; STANFORD
SOLOMON; & GABRIEL PINILLA,

           *Defendants*.

CASE NO:

---

## CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, MICHAEL W. KENNY, through undersigned counsel, on behalf of himself individually and on behalf of all other similarly situated individuals files this Complaint for damages and injunctive relief against Defendants Critical Intervention Services, Inc., KKP Holdings, LLC d/b/a The KKP Security Group, Karl Poulin, Kimberly Poulin, The Solomon Law Group, P.A., Stanford Solomon, & Gabriel Pinilla[1] and in support states:

---

[1] Plaintiff Michael W. Kenny is referred to as "Mr. Kenny." Defendants The Solomon Law Group, P.A. ("Solomon Law"), Stanford Solomon, & Gabriel Pinilla are collectively referred to as "Solomon Defendants." The Solomon Defendants, Critical Intervention Services, Inc. ("CIS"), KKP Holdings, LLC d/b/a The KKP Security Group ("KKP"), Karl Poulin, and Kimberly Poulin, are collectively referred to as "Defendants."

## **INTRODUCTION**

1.      This action arises out of a long-running conspiracy to restrain trade and suppress competition in the private security guard industry, primarily throughout the State of Florida

2.      The central architect of this conspiracy is Karl Poulin, a Florida businessman who owns and/or controls various private security guard-related companies and holds leadership roles in a variety of industry groups and trade associations.

3.      Karl Poulin, his wife Kimberly Poulin and their companies CIS and KKP have entered customer allocation and no-poaching or no-hiring agreements with competing private security companies throughout Florida and beyond. Under these agreements, competing private security companies agree that they will not compete for each others' customers and will not hire their rivals' employees.

4.      These agreements are all part of one overarching conspiracy to restrain trade and suppress competition in the private security guard industry.

5.      The focus of the instant lawsuit is the Defendants' efforts to restrict competition in the input (e.g. labor) market.

6.      CIS and KKP have entered illegal no-hire or no-poaching agreements with a singular goal: To restrict employee mobility and suppress wages. Defendants' actions violate antitrust law. Defendants must be punished to the furthest extent permitted by law and immediately enjoined to prevent further harm to the public and to competition.

7.      This is an action injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 and for damages caused by Defendants' willful and continuous violations of the Sherman Act, 15 U.S. Code § 1.

**JURISDICTION AND VENUE**

8.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Section 16 of the Clayton Act, 15 U.S.C. § 26 to award equitable and injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) to award damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because the Defendants are subject to personal jurisdiction in this District and because certain of the acts giving rise to the claims occurred in this District.

**PARTIES**

10.     Plaintiff Mr. Kenny is a Florida resident who resides in Pasco County, Florida. He is a single father of four and military veteran. From January 13, 2017 through February 22, 2017, Mr. Kenny was employed by CIS as a private security guard. His rate of pay was less than $12 per hour. Upon hiring, he was forced to sign CIS's standard non-solicitation, non-competition, and confidentiality agreement.

11.     Defendant CIS is a Florida for-profit corporation organized and existing under the laws of Florida with a principal place of business in Pinellas County at 13777 Belcher Road South, Largo, Florida 33771. Defendant CIS is primarily engaged in the business of providing private security services for residential properties, such as apartment complexes, and commercial properties such as banks. Defendant CIS holds itself out as conducting business throughout the world.

12.     Defendant KKP is a Florida for-profit corporation organized and existing under

the laws of Florida with a principal place of business in Pinellas County at 13777 Belcher Road South, Largo, Florida 33771. Defendant KKP holds itself out as a trade association of private security companies throughout Florida and beyond.

13.     Defendant Karl Poulin is an individual residing in Pinellas County, Florida. Defendant Karl Poulin is a leading figure in the American private security industry. Defendants Karl and Kimberly Poulin exercise control over Defendants CIS and KKP.

14.     Defendant Kimberly Poulin is an individual residing in Pinellas County, Florida. Defendant Kimberly Poulin is the Human Resources Director of CIS. She also holds the role of Chief Financial Officer for KKP. Defendant Kimberly Poulin is married to Defendant Karl Poulin and is a partial owner of Defendants CIS and KKP. At all material times, Kimberly Poulin has actively coordinated with Karl Poulin regarding CIS's hiring process, competition for labor, wages, and other employment related matters.

15.     Defendant Solomon Law is a law firm located at 1881 West Kenny Boulevard, Suite D, Tampa, Florida. Defendant Solomon Law has served as CIS's outside counsel since at least July 2014 and has played an active role in helping Defendants CIS, KKP, Karl Poulin, and Kimberly Poulin plan, orchestrate, and implement their antitrust conspiracy.

16.     Defendant Stanford Solomon is an individual residing in Hillsborough County, Florida. Defendant Solomon is the owner and principal of Defendant Solomon Law. Defendant Solomon is an attorney admitted to practice law in the State of Florida. Since at least August of 2014, Defendant Solomon has served as CIS's outside counsel and has played an active role in helping Defendants CIS, KKP, Karl Poulin, and Kimberly Poulin plan, orchestrate, and implement their antitrust conspiracy.

17.     Defendant Gabriel Pinilla is an individual residing in Pinellas County, Florida. Defendant Pinilla is an employee of Defendant Solomon Law. Defendant Pinilla is an attorney admitted to practice law in the State of Florida. Since at least August 2014, Defendant Pinilla has served as CIS's outside counsel and has played an active role in helping Defendants CIS, KKP, Karl Poulin, and Kimberly Poulin plan, orchestrate, and implement their antitrust conspiracy.

## GENERAL ALLEGATIONS

### *Wage Suppression in the Private Security Industry*

18.     More than one million American men and women work as private security guards. Often at the risk of their own personal safety, these individuals guard, patrol, or monitor premises and property to prevent theft and violence.

19.     Most of these men and women lack higher education or valuable trade skills that would enable them to earn a better living. As such, they sell their labor for modest wages.

20.     For years, the private security guard industry has been characterized by harsh working conditions and low wages. As former CIS employee puts it: "They pay you what a department store clerk makes and ask you to carry a gun and go hands on with criminals putting your life on the line for $11 an hour."

21.     According to the Bureau of Labor Statistics, as of May 2017, there were nearly 85,000 private security guards employed throughout Florida.

22.     Low wages and wage stagnation are particularly acute problems in the State of Florida.

23.     While the average rate for private security guards nationally is approximately $14.78 per hour, the average hourly rate for private security guards in Florida is approximately

$12.09.

24.     One of the reasons why security guard wages in Florida lag so far behind the national average is that the private security guard industry in Florida is riddled with collusion among competitors designed to restrict employee mobility and suppress wages.

25.     If a private security company requires all of its security guards to sign non-compete agreements while the company simultaneously enters no-poaching or no-hiring pacts with its rivals, that company will have a greater ability to retain employees and pay those employees lower wages than would be required in a competitive market.

26.     That is exactly what is happening here. Using his role as a leading figure within both the Florida and national private security industry, Karl Poulin, acting in concert with his wife and business partner Kimberly Poulin, their companies CIS and KKP, and their lawyers from the Tampa-based Solomon Law Group have facilitated and entered into a massive and wide-ranging antitrust conspiracy designed to restrict employee mobility and suppress wages in the private security guard industry throughout Florida and beyond.

27.     Mr. Kenny, hundreds of current and former CIS employees, and likely thousands of other private security guards throughout Florida are the victims of this conspiracy. Defendants' conduct has prevented these men and women from selling their labor in a competitive market, driving many of these men and women deeper into poverty and despair.

### *Karl Poulin: A Leading National Figure in the Private Security Industry*

28.     For the past thirty years, Karl Poulin has been a leading figure in the private security industry both in Florida and nationally.

29.     Karl Poulin has served as President and Chairman of the Board of the Florida

Association of Security Companies, an Advisory Council Member of Executive Security International, and a member of the Board of Directors of the International Foundation for Protection Officers.

30.     In 1995, Karl Poulin founded CIS. Since then, he has served as CIS's president and CEO. CIS holds itself out as "provid[ing] a range of specialized security and investigation services to businesses, governments, and individuals in Florida and throughout the world."

31.     In 2004, Karl and Kimberly Poulin founded KKP. KKP is an acronym for Karl & Kimberly Poulin.  KKP holds itself out as "an alliance of companies with diverse specializations in security" intended to provide comprehensive security services throughout the United States.

32.     CIS, KKP, Karl Poulin, and Kimberly Poulin have gone to tremendous lengths to suppress any and all competition for security guard labor in the State of Florida and beyond.

33.     CIS requires entry-level security guards to sign non-compete agreements at the time of their initial hire. As a company, CIS has massive attrition. Many new hires quit or are terminated after only a few weeks with the company. The result: CIS frequently demands that individuals who spent a very short tenure working with CIS are prohibited from working as security guards anywhere else for two years following the termination of their employment. To be clear: CIS's employee non-compete agreements serve no purpose other than to restrain fair and lawful competition, restrict employee mobility and suppress wages. They are illegal restraints of trade.

34.     But CIS, KKP, Karl Poulin, and Kimberly Poulin are so deathly afraid of fair competition that they have gone even further: They orchestrated a massive conspiracy in restraint of trade designed to prevent competition for security guard labor, restrict employee mobility, and

ultimately suppress wages. This antitrust conspiracy has two key components: (1) collusion through the trade associations KKP and FASCO and (2) settlement agreements.

35.     For years, CIS, KKP, Karl Poulin, and Kimberly Poulin – aided and abetted by the Solomon Defendants – have taken the following approach to competition: Have everyone – including competitors – sign formal non-compete and non-solicitation agreements, or, at the very least, agree to a "gentleman's" no-poaching agreement.

36.     Although this model of surrounding one's business on all sides with non-compete, non-solicitation, no-hiring, and no-poaching agreements may be standard operating procedure for the Defendants, many aspects of that model are *per se* antitrust violations.

### *Collusion Through KKP and Other Trade Associations*

37.     At all material times, Karl and Kimberly Poulin have exercised complete control over CIS and KKP.

38.     CIS, KKP, Karl Poulin, and Kimberly Poulin have used the guise of trade associations to recruit competing private security guard companies into their antitrust conspiracy. These trade associations include the KKP Security Group and the Florida Association of Security Companies ("FASCO").

39.     Karl Poulin is FASCO's Chairman of the Board. Not surprisingly, FASCO's principal address is 1377 Belcher Rd., South Largo, FL. That is the same address as CIS and KKP.

40.     Other major players involved in FASCO include G4S Secure Solutions (USA), Inc. G4S Secure Solutions was founded as Wackenhut. It is a subsidiary of the multi-billion dollar, multinational, London-based security company G4S plc. G4S plc is the world's largest security company. With more than 600,000 employees, G4S plc is also one of the world's largest private

employers.

41. CIS requires an agreement with broad restrictions on any competitive activity from every competitor that becomes involved in KKP and attempts to obtain the same in connection with any involvement in FASCO.

42. Specifically, CIS requires all other private security companies involved in KKP to agree to the following competitive restrictions:

    a. The competitor agrees not to compete against CIS for any customers where CIS forbids competition.

    b. The competitor agrees not to solicit or hire any CIS employees.

    c. The competitor agrees not to solicit or do business with any CIS customers.

43. In exchange for these concessions, CIS agrees that it will not hire or solicit the competitors' employees and will not solicit or pursue the competitors' customers.

44. CIS attempts to obtain the same agreement from competitors involved in FASCO.

45. Any deviation from the terms of the conspiracy requires all co-conspirators with an interest in the employee or client at-issue to agree to an exception to the restrictions listed *supra*. For example, if a co-conspirator wanted to hire a former CIS security guard, in contravention of the conspiracy, they would first need to obtain CIS's permission.

46. The Poulin/CIS/KKP model of restraining trade and eliminating competition is not necessarily the most artful. It involves a hodge podge of different agreements among CIS/KKP and various competitors. Some agreements are formal written contracts. Other agreements are informal and made via email or text message. And still other agreements are spoken "gentleman's agreements" between Karl Poulin – on behalf of CIS – and his competitors. But an inartful

conspiracy in restraint of trade is an illegal antitrust conspiracy nonetheless.

47.    From at least January 1, 2014, either orally or in writing, CIS and KKP have entered an antitrust conspiracy on the terms outlined *supra* or substantially similar terms with more than a dozen competitors, several of them located within Florida. Those entities include but are not limited to:

   a.  **Advanced Protection Services, LLC,** located in Myrtle Beach, South Carolina;

   b.  **Anlance Protection, Ltd.**, located in Fort Collins, Colorado;

   c.  **American Security, LLC d/b/a Heartland Investigative Group and d/b/a Heartland Corporate Security**, located in St. Paul, Minnesota;

   d.  **Bales Security Agency, Inc.**, located in St. Petersburg, Florida;

   e.  **Black Ice Security Services, Inc.**, located in Brandy Station, Virginia;

   f.  **Executive Solutions Worldwide, LLC**, located in Lake Mary, Florida;

   g.  **Freeman Security Services, Inc.**, located in Haines City, Florida;

   h.  **High-Class Security, Inc.**, located in Miami, Florida;

   i.  **Invictus, Inc. d/b/a Invictus Security**, located in Boynton Beach, Florida;

   j.  **Kane Consulting Group, Inc.**, located in Ogden, Utah;

   k.  **Omega Protective Services, LLC**, located in Phoenix, Arizona;

   l.  **Paradigm Security Services, Inc.**, located in Suwanee, Georgia;

   m.  **PCI Security, Inc.**, located in Orlando, Florida;

   n.  **Reynolds Protection, LLC**, located in Dallas, Texas;

   o.  **Security Management Solutions, Inc.**, located in Lee's Summit, Missouri;

   p.  **The World Protection Group, Inc.**, located in Carson City, Nevada.

48.    Specifically, CIS/KKP entered a no-hiring and no-poaching conspiracy with:

a.   PCI Security, Inc., on approximately August 21st, 2014;

b.   Security Management Solutions, Inc., on approximately February 9th, 2016; and

c.   Freeman Security Services, Inc., on approximately October 5th, 2016.

49.     The exact dates upon which CIS/KKP entered its no-hiring and no-poaching conspiracy with the remainder of the competitors listed *supra* are presently unknown.

50.     CIS and KKP's patchwork of non-compete, no-poaching, no-hiring and non-solicitation agreements with *competitors* are not reasonably necessary to a larger legitimate collaboration between these different companies.

### *Lawsuits, Settlement Agreements, & Solomon Law*

51.     The at-issue antitrust conspiracy would not have thrived as it did and grown to its present scope without the involvement of a law firm. That law firm is Solomon Law.

52.     Since at least August 2014, Solomon Law, Attorney Stanford Solomon, and Attorney Gabriel Pinilla have conspired with CIS, KKP, Karl Poulin, and Kimberly Poulin to advance the illegal aims of this conspiracy in restraint of trade.

53.     At the inception of their involvement with CIS and KKP, the Solomon Defendants had the opportunity to advise Karl Poulin, Kimberly Poulin, CIS, and KKP that their efforts to obtain no-poaching agreements with competitors were illegal, counsel the other Defendants against further involvement in an illegal antitrust conspiracy, and take steps to immediately end that conspiracy.

54.     But instead of working to end the illegal conduct, the Solomon Defendants played an active role in furthering the conspiracy and enhancing the other Defendants' ability to restrict competition, limit employee mobility and suppress wages.

55.     The Solomon Defendants serve as CIS's go-to law firm for enforcing employee non-compete agreements with security guards, which agreements themselves are illegal for lack of any legitimate business interest.

56.     But the role of the Solomon Defendants is not limited to suing $12 an hour security guards to enforce legally suspect non-compete agreements. It goes far beyond that.

57.     At the behest of CIS, KKP, Karl Poulin, and Kimberly Poulin, the Solomon Defendants have leveraged individual employee non-compete cases into horizontal restraints of trade and a full-blown antitrust conspiracy.

58.     In approximately July 2014, the Solomon Defendants began representing CIS in a then-pending case styled as *Critical Intervention Services, Inc. v. PCI Security, Inc. et. al.*, Case No. 14-2986 (Fla. 6th Jud. Cir. Ct. 2014) ("PCI Litigation"). The case involved CIS suing a competitor and two former employees over their security guard non-compete agreements.

59.     Early in the PCI Litigation, the Court refused to enjoin the former CIS employees from working for PCI. Shortly thereafter, Stanford Solomon and Solomon Law became CIS's counsel of record.

60.     The Solomon Defendants took the other Defendants' efforts to restrain trade to new heights. They fed into Karl and Kimberly Poulin's neurosis about competition. They gave confirmation to Karl and Kimberly Poulin's philosophy about labor and competition. That philosophy was this: CIS's workers are assets and property. CIS has a valid claim to those workers. CIS has the right to restrict those workers and their job opportunities. CIS has the right to prevent competitors soliciting and "pilfering" its employees. That right against competition for employees or "pilfering" is unqualified and is – in and of itself – both a legitimate business goal

and self-justifying.

61.    In approximately August 2014, the Solomon Defendants became the architects of CIS's strategy of leveraging employee non-compete agreements with individual security guards and turning them into no-poaching and no-hiring agreements with industry rivals.

62.    In the PCI Litigation, CIS and the Solomon Defendants eventually prevailed upon PCI and the individual defendants to settle. There were two parts of that settlement.

63.    Part one involved the Solomon Defendants writing a Permanent Injunction Order that lauds CIS as an extraordinary, precedent-setting company and concludes that permanent injunctive relief is absolutely necessary to protect CIS's substantial customer relationships, its confidential information, and its extraordinary investment in security guard training. Among the highlights of the Permanent Injunction Order:

   a.   "The employment qualifications are notably arduous and the universal employee (particular officer) training requirements are specialized, extraordinary, and remarkably extensive."

   b.   "The substantial investment made by CIS in the development and implementation of its philosophies and methodologies (through extensive and intensive training of its personnel) has created a valuable **asset** for CIS that is worthy of protection in the marketplace and creates a legitimate business interest justifying **unqualified enforcement** of the restrictive covenants prohibiting solicitation and prohibiting competition." (emphasis added).

   c.   CIS is entitled to "**protection of CIS's work force from solicitation and pilfering by competitiors**". (emphasis added).

    d.   Listing "OC (pepper spray) training and certification" as part of CIS's "extraordinary and specialized training" provided to security guards.

    e.   Concluding that CIS was suffering "irreparable harm in the form of (a) competition with former CIS employees who agreed not to engage in competition and (b) confusion regarding and possible dilution of CIS's contractual rights . . ."

64.    To state the obvious, the Court did not write the Permanent Injunction Order. The Solomon Defendants wrote the order, replete with numerous falsehoods and exaggerations about the extraordinary nature of CIS's business model and its supposed legitimate business interests. The Court had absolutely no involvement with the Permanent Injunction Order other than signing it.

65.    Via the Solomon Defendants, CIS made the following offer to PCI: CIS and its lawyers would submit a Permanent Injunction Order holding that its security guard non-compete agreements are necessary to protect various legitimate business interests and entitled to "unqualified enforcement". The order would be submitted to the Court as an an agreed, unopposed order.

66.    The Permanent Injunction Order was incredibly valuable to CIS. It would give CIS what it had long been seeking: The force of law. A court order holding CIS's non-compete agreements were entitled to "unqualified enforcement" would go a long way toward protecting its position in the market, preventing employee mobility and ultimately suppressing wages.

67.    But the Permanent Injunction Order was not enough. CIS and the Solomon Defendants strong-armed PCI into agreeing that it would not hire any CIS or KKP employees.

68.    In exchange for PCI agreeing to these terms, CIS/KKP agreed that it would not

hire any of PCI's employees.

69.    PCI and the former employees simply did not have the financial resources to fight a company like CIS. On approximately August 21st, 2014, PCI accepted CIS's terms.

70.    The at-issue no-poaching agreement was demanded by Karl and Kimberly Poulin, entered into between CIS/KKP and PCI, and negotiated and memorialized by Stanford Solomon and Gabriel Pinilla of Solomon Law.

71.    In September 2016, Defendants repeated this exact same process in *Critical Intervention Services, Inc. v. Freeman Security Services, Inc. and Daniel Boulton*, Case No. 16-005593 (Fla. 6th Jud. Cir. Ct. 2016) ("Freeman Litigation").

72.    Just as in the PCI Litigation, the Freeman Litigation ended with a Permanent Injunction Order that sung CIS's praises, held that CIS had proven the existence of numerous legitimate business interests, and granted CIS "unqualified enforcement" of its security guard non-compete agreements.

73.    Once again, the Solomon Defendants wrote the Permanent Injunction Order. Once again, the defendants could not afford to litigate. Once again, the Permanent Injunction Order was submitted to the Court as agreed and unopposed, and promptly signed by the Court.

74.    Just as in the PCI Litigation, Karl and Kimberly Poulin insisted upon the same deal: Freeman Security would agree to entry of the Permanent Injunction Order and agree not to hire any CIS security guards. In exchange, CIS would drop the lawsuit and CIS/KKP would agree not to hire any Freeman Security's employees. On approximately October 5th, 2016, Freeman Security agreed to these terms.

75.    Just as in PCI Litigation, the Solomon Law Group, Stanford Solomon, and Gabriel

Pinilla were instrumental in negotiating and memorializing the deal via email correspondence and telephone calls to Freeman's counsel.

76.     The CIS/KKP no-poaching and no-hiring agreements made on the back-end of litigation are not immune from antitrust scrutiny. They are horizontal restraints of trade that serve no legitimate purpose and, instead, operate only to restrict employee mobility and suppress wages.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action on behalf of himself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3). The proposed Class is defined as follows:

> All natural persons employed by CIS and/or KKP as private security guards in the United States during the period from January 1, 2014 through the present day.

78.     Excluded from the Class are: Corporate officers, members of the boards of directors, and senior executives of Defendants who entered into the illicit agreements alleged herein; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

79.     Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes if appropriate.

80.     The Class is so numerous as to render joinder of all members impracticable. Plaintiff does not yet know the exact size of the Class, because such information is in the exclusive control of Defendants. On information and belief, Plaintiff alleges that the class will exceed 1,000 individuals, many of whom will be located within Florida, but dozens of whom will be dispersed throughout the country.

81.     Common questions of law or fact exist to all members of the Class and predominate over any issues solely affecting individual Class members. The common and predominating questions of law or fact include but are not limited to:

    a.   whether Defendants' conduct violated the Sherman Act;

    b.   whether Defendants' conspiracy and associated agreements described herein constitute *per se* violations of the Sherman Act;

    c.   whether Defendants' conspiracy and associated agreements restrained trade, commerce, or competition for security guard labor;

    d.    whether Defendants entered into contracts, combinations, and/or conspiracy in restraint of trade to increase profits for themselves;

    e.   the duration of the conspiracy;

    f.   whether Plaintiff and the Class suffered antitrust injury;

    g.   whether Plaintiff and members of the Class are entitled to declaratory and/or injunctive relief and, if so, the nature and extent of such relief;

    h.   the difference between the total compensation that Plaintiff and the Class received from Defendants and the total compensation Plaintiff and the Class would have received from Defendants in the absence of the illegal acts, contracts, combinations and conspiracy alleged herein; and

    i.   whether actual damages, costs, disgorgement, and/or treble damages should be awarded.

82.     Plaintiff's claims are typical of the claims of the Class, as Plaintiff and all members of the Class share the same injury. As alleged herein, Plaintiff and Class members sustained

damages arising out of the same illegal actions and conduct of Defendants.

83. The identities of the members of the class – as tentatively defined – are readily ascertainable. Defendants CIS and KKP have readily available records regarding all employees or former employees of either company since January 1, 2014.

84. Plaintiff is willing and prepared to serve the class in a representative capacity with all the obligations and duties material thereto. Plaintiff will fairly and adequately represent and protect the interests of the Class and has no interests adverse or in conflict with the interests of the other members of the Class.

85. Plaintiff has retained the undersigned competent counsel, who is experienced in antitrust litigation and class action litigation and will adequately prosecute this action and adequately assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

86. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

87. Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.

88. The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

89. The interest of Class members in individually controlling the prosecution of

separate actions is theoretical and not practical. This is particularly true given the unique nature of the Class members' claims, which spring from Defendants' rampant, systematic suppression of individual low-income laborers' earnings. The Class has a high degree of similarity and is cohesive, Plaintiff anticipates no difficulty in the management of this matter as a Class.

## COUNT I

### Violations of the Sherman Act, 15 U.S.C. § 1
### (as to all Defendants)

90.     Plaintiff repeats and realleges Paragraphs 1 through 86 as if fully set forth herein.

91.     Since at least January 1, 2014, and continuing to the present day, Defendants CIS, KKP, Karl Poulin, and Kimberly Poulin have conspired to restraint competition in the private security guard industry throughout Florida and beyond.

92.     Since at least August 2014, the Solomon Defendants have taken part in that conspiracy by negotiating no-poaching and no-hiring agreements by and between Defendants and, at a minimum, the competing companies PCI Security and Freeman Security.

93.     All Defendants have conspired to facilitate the entry of CIS and KKP into unlawful horizontal agreements in restraint of trade and commerce as described above and in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

94.     These agreements have included agreements by and between CIS/KKP and the competitors identified above that (a) eliminate, to a substantial degree, competition among these competitors for private security guard labor; (b) eliminate, to a substantial degree, competition among these above competitors for customers; and (c) artificially suppress compensation of Plaintiff and the Class to levels below what would be paid in a competitive market.

95.     As a direct and proximate result of Defendants' contracts, combinations, and

conspiracies to restrain trade and eliminate competition, Class members have suffered injury and have been deprived of the benefits of free and fair competition.

96.     The unlawful agreements among Defendants and the competing companies listed above has had the following effects, among others:

    a.   Competition among private security entities has been suppressed, restrained and eliminated; and

    b.   Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of Defendants' unlawful agreements, and, as a result, have been injured and suffered damages in an amount to be proven at trial.

97.     Defendants' contracts, combinations and conspiracies are per se violations of Section 1 of the Sherman Act.

98.     Accordingly, Plaintiff and members of the Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

a.   Certify that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the designated Class representative and Plaintiff's counsel as Class counsel;

b.   Declare Defendants have engaged in conduct, contracts, combinations and a conspiracy in violation of Section 1 of the Sherman Act and Plaintiff and members of the Class have been damaged in their business and property as a result of this violation;

c.   Declare that the alleged conduct, contracts, conspiracy and combinations be adjudged and decreed *per se* violations of the Sherman Act;

d.   Declare that Plaintiff and members of the Class be entitled to equitable relief, including a judicial determination of the rights and responsibilities of the parties;

e.   Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, agents, and employees thereof and all other persons acting or claiming to act on their behalf from, in any manner, continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

f.   Award actual damages, costs, disgorgement, and/or treble damages under applicable law in an amount to be determined;

g.   Require Defendants to pay both pre- and post-judgement interest on any

amounts awarded; and

h.   Such other relief as this Court shall deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiff demands a trial by jury on all issues so triable.

Dated: March 14, 2019

Respectfully submitted,
By: s/ *Jonathan Pollard*
Jonathan Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com
 **Trial Counsel**

**Pollard PLLC**
401 E. Las Olas Blvd.  Ste. 1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731

*Counsel for Plaintiff Michael W. Kenny and the proposed Class*